**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

FRANCESCA AMIKER

    Plaintiff,

v.

ALICIA BROWN,

    Defendant.

Civil Action File No.

_____

## COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

Plaintiff Francesca Amiker ("Amiker" or "Plaintiff"), by and through her undersigned counsel, hereby states her Complaint for Damages and Demand for Jury Trial against Defendant Alicia Brown ("Brown" or "Defendant"), as follows:

### INTRODUCTION

1. This Complaint arises from social media posts by Defendant on or about May 12, 2026, and again on or about June 6, 2026, where Defendant made false and defamatory statements about Amiker, including that Amiker was engaged in an affair with Defendant's husband and that Amiker was the reason Defendant suffered an apparent physical assault after Defendant publicized visible injuries to her face.

2. Amiker has not engaged in an affair with Defendant's husband.

3. Amiker has not intermeddled with the intimate relationship between

1

Defendant and Defendant's husband.

4.      Amiker and Defendant's husband are merely professional colleagues with a working relationship.

5.      Despite this, Defendant sought to irreparably damage Amiker's reputation by conveying to an average reader and/or listener on Instagram that Amiker engaged in an illicit affair, that Amiker's relationship with Defendant's husband was the reason for Defendant's divorce, and that Defendant was physically assaulted because of Amiker.

6.      Defendant sought to cast Amiker as a dishonest and unscrupulous mistress and homewrecker willing to leverage her career to engage in an untoward affair with a married man.

7.      Defendant sought to cast Amiker as an accomplice in the destruction of an otherwise healthy marriage.

8.      Defendant sought to cast Amiker as a violent person and/or someone who condones violence towards women.

9.      Defendant made these knowingly false and defamatory statements about Amiker negligently and with actual malice.

10.     On information and belief, Defendant made these knowingly false and defamatory statements about Amiker to promote Defendant's forthcoming "App" with the working title "#hesaidshesaid".

2

11.    As intended, Defendant's false and defamatory statements have permanently damaged Amiker's character and reputation.

12.    As a result of the conduct described herein, Defendant is liable to Amiker for actionable defamation.

## PARTIES

13.    Amiker is an individual who is a citizen of the State of Georgia and resides in Fulton County, Georgia.

14.    Brown is an individual who affirmatively asserts a citizenship of the State of North Carolina.  Brown specifically denies any citizenship or residency in the State of Georgia.  Attached hereto as **Exhibit A** is a true and accurate copy of communications between counsel for Amiker and Brown regarding the citizenship or residency of Brown ("Also, please not [sic] my primary residence is and has always been North Carolina.").

## JURISDICTION AND VENUE

15.    Amiker is a citizen of the State of Georgia for purposes of diversity jurisdiction under 28 U.S.C. § 1332.

16.    Brown is a citizen of the State of North Carolina for purposes of diversity jurisdiction under 28 U.S.C. § 1332.

17.    This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332, as there exists complete diversity of citizenship between

3

Plaintiff and Defendant and the amount in controversy exceeds $75,000, exclusive of interest and costs.

18.    This Court has personal jurisdiction over Defendant pursuant to O.C.G.A. § 9–10–91, as she owns, uses, or possesses real property situated within this State.  Specifically, on June 24, 2026, the Fulton County Superior Court awarded Defendant sole and exclusive use of the family residence located in Atlanta, Georgia, Fulton County.  Attached hereto as **Exhibit B** is a true and accurate copy of the Family Violence Ex Parte Protective Order issued in favor of Defendant.[1]

19.    This Court has personal jurisdiction over Defendant because her intentional and tortious actions were expressly aimed at Georgia, as Defendant knew her false and defamatory statements would have a "potentially devastating impact" on Amiker.  *Calder v. Jones*, 465 U.S. 783, 789-90 (1984).  Defendant knew "that the brunt of that injury would be felt by [Amiker] in the State in which she lives and works[.]"  *Id.*  As such, Defendant must "reasonably anticipate being haled into court" in the State of Georgia "to answer for the truth of the statements" made in her social media posts.  *Id.* at 790 (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)).

---

[1] Certain redactions have been applied to Exhibit B pursuant to Federal Rule of Civil Procedure 5.2, where individuals known to be minor children and their family residence are identified.

20.   Accordingly, sufficient minimum contacts exist with respect to Defendant and the claims at issue in this case to satisfy the requirements of due process.

21.   Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2), as a substantial part of the events giving rise to this action occurred in this District.

## FACTUAL BACKGROUND

### *Francesca Amiker*

22.   Amiker is a highly respected, four-time Emmy award-winning journalist, television host, radio personality, actress, motivational speaker, and media professional.

23.   Amiker is a native of Atlanta, where she has made meaningful connections in her community since childhood.  Today, she is an advocate for and mentor to young women and girls in the Atlanta community.

24.   Over the course of her sixteen-year career in journalism, Amiker has approached her profession with self-respect and integrity.

25.   Amiker has represented local and national media organizations around the world, including at major entertainment events, and has consistently maintained an unblemished professional reputation that is essential to her livelihood.

26.   In September 2024, Amiker was invited to the White House and

recognized for her longstanding contributions and commitment to excellence and public service in journalism.

27.    In October 2022, Amiker was inducted into the Vanderbilt University Media Hall of Fame as the youngest journalist in the University's history to receive this distinction.  This recognition highlighted Amiker's professional achievements, ethical leadership, and contributions to the field of journalism.

28.    Amiker further serves on the leadership and advisory boards of Vanderbilt University, where she mentors and supports the next generation of journalists.

29.    Amiker's civic engagements with her alma mater are deeply important to her and further demonstrate a longstanding commitment to education, professional integrity, and community engagement.

30.    Amiker's career and personal brand are defined by accuracy, fairness, and maintaining the confidence of the public she serves and the organizations that entrust Amiker with their brands.

31.    Without question, public trust, credibility, professionalism, and good moral character are central to Amiker's profession.

32.    On or about May 11, 2026, Amiker began her on-air radio co-host position with the Big Tigger Morning Show on V-103 Atlanta alongside Darian Morgan ("Morgan"), professionally known as Big Tigger.

6

33.     Prior to joining the Big Tigger Morning Show as co-host, Amiker previously worked as a morning anchor on 11Alive and a national correspondent for E! News.

34.     As a native of Atlanta, Amiker was excited to return home to become part of the legacy of V-103 as a radio personality on a major platform.

35.     This career milestone quickly became the source of unwarranted anxiety, fear, humiliation, embarrassment, and overall mental and emotional distress as a result of Defendant's false and defamatory statements about Amiker.

### *Defendant Plant Seeds of Doubt Regarding Amiker and Morgan*

36.     On or about May 11, 2026, certain social media accounts on Instagram began commenting under a V-103 promotional post celebrating Amiker's addition to the Big Tigger Morning Show, stating that Defendant was "in the hospital probably because [Morgan] is probable [sic] messing with @francescaamiker."

7



37.    The Instagram account for @francescaamiker refers to Amiker.

38.    Amiker was tagged in the promotional post as a collaborator, which populates the promotional post on her Instagram page to be viewed by her over 66,000 followers.

39.    On information and belief, the Instagram accounts identified as @nursekat.rn19 and @yourtravelingbestie_ are social media accounts controlled by Defendant.  Specifically, the @yourtravelingbestie_ account was previously @lemonadeselfiemuseum, which was the official Instagram account for Defendant's former business in Baltimore, Maryland, Lemonade Selfie Museum.

40.    The @nursekat.rn19 user purported to have information on a "report"

on or about May 11, 2026, that Morgan "said the altercation happened because of

his new co host. @v103atlanta yall messy!"



41.    The @nursekat.rn19 user purported to have further information on or

about May 11, 2026, regarding alleged injuries to Defendant's face.



9

42.    There were no public reports of any physical altercation between Defendant and Morgan or alleged injuries to Defendant's face at the time of the above posts on or about May 11, 2026.

43.    On or about May 12, 2026, certain social media accounts on Instagram further commented under a V-103 promotional post where Amiker was tagged as a collaborator and made false, disparaging, and demeaning statements about Amiker, including seeing "the messages yesterday about her messing with Big Tigger. Now we all know how she got the job."



44.    On information and belief, the Instagram account identified as @lakenny75 is a social media account controlled by Defendant.  Specifically, the @lakenny75 account was created in May 2026 and only appears to speak

negatively about Amiker.

45.    On or about May 12, 2026, Defendant responded to @lakenny75 as @thecyberbae under the same V-103 promotional post and stated, "Yes we are getting a divorce over his relationship with Francesca but it was not your place to tell everyone.  However I do thank you for confirming what I already knew! Can you DM me please".



46.    The Instagram account for @thecyberbae refers to Defendant.

47.    Defendant's comment conveyed and was intended to convey the impression that Amiker and Morgan engaged in an illicit affair that caused the dissolution of Defendant's marriage.

48.    There is no "relationship" between Amiker and Morgan other than a professional relationship as colleagues.

49.    The truth did not matter to Defendant, as she continued to publish false and defamatory statements and impressions about Amiker.

50.    On or about June 6, 2026, Defendant published on her @thecyberbae Instagram page an approximately 24-second video of herself with an apparent injury to her face while weeping.  Defendant captioned her post "Someone ask my husband why my face happened @francescaamiker".



51.    Defendant knows @francescaamiker does not refer to Morgan, but rather Amiker.

52.    Defendant's post, which has since been deleted, conveyed and was

intended to convey the impression that Defendant was the victim of a violent attack for which Amiker was responsible for Defendant's injuries.

53.    To an average reader and/or listener on Instagram, Defendant's false and defamatory post further conveyed and was intended to convey that Amiker was either Defendant's perpetrator or that Amiker condoned, encouraged, or allowed Defendant to be physically assaulted.

54.    Defendant further amplified the false impression she hoped to convey about Amiker by stating on or about June 12, 2026, that she had "never called [her] husband an abuser."



**BROWN GIRL GRINDING** ⭐ ✔
@LorenLorosa

just received a Statement from Alicia Brown— the wife of big tigger .. they are currently the focus of an alleged domestic dispute investigation following a video alicia posted of her bruised face with the caption "Someone ask my husband why my face happened" —

She says - she never called her husband an abuser

STATEMENT: I want to be clear: I have never called my husband an abuser. Social media has drawn its own conclusions from information that was shared, but those conclusions are not statements I have made. I respect the legal process and believe law enforcement should be allowed to do its job without interference from anyone, including me.

In recent days, many claims, opinions, and narratives have circulated publicly. While I understand that people will form their own views, I remain confident that the facts will speak for themselves in due time. Until then, my focus remains on my family, my peace, and protecting those I love.

I love my family and I will not engage in public debates, speculation, or personal attacks and bitterness. I am not hiding, and I stand firmly by my character and integrity. I respectfully ask for patience as I follow the guidance of my legal counsel and allow the process to unfold.

Thank you to those who have extended prayers, support, and understanding during this time.

13

55.     At no point has Defendant ever cleared Amiker's name regarding Defendant's post displaying her injured face and mentioning Amiker in the post by name.

56.     Major online publications, some with millions of followers across multiple social media platforms, have republished Defendant's false claims regarding Amiker and Morgan to their readership, which have garnered thousands of comments from the public questioning Amiker's morality, expressing profound disappointment, and, in some cases, further denigrating her character.

57.     It is no exaggeration that Defendant's lies have been echoed around the world many times over.

### *Defendant Leveraged the Widespread Controversy to Promote her Forthcoming App: #hesaidshesaid*

58.     Days after posting her injured face on Instagram and implicating Amiker in Defendant's apparent physical assault, Defendant made a series of posts on Instagram and Threads.

59.     On Instagram, Defendant posted "Loading…." on her Stories.

60.     Defendant was less cryptic on Threads and stated in separate posts, "Now that I have your attention. App loading……" and "#hesaidshesaid," which, on information and belief, is the working name for the app.



61.   On information and belief, Defendant publicized her false and defamatory statements about Amiker to garner the attention of the masses, so that Defendant could effectively promote her forthcoming app.

62.   Because Defendant was a private individual and relatively unknown prior to her false and defamatory posts about Amiker, Defendant continues to clamor for fame and relevance through her Instagram profile.

63.   Recently, on June 25, 2026, Defendant posted an Instagram Story, indicating that she takes "full responsibility for posting the video of [her] face," without acknowledging her direct inclusion of Amiker's name in the post.

64.   Defendant further stated that she plans to "identify the appropriate

15

platform" to tell her side of the story, teasing "But…. It is coming.."  On information and belief, this is further promotion for Defendant's forthcoming app.

65.    To further maintain relevancy, Defendant has begun leaking false information to media platforms, including bloggers on YouTube, to further amplify the false and defamatory narrative that Amiker engaged in an affair with Defendant's husband.

### *Amiker's Professional and Personal Reputation is Permanently Damaged*

66.    In the blink of an eye—or as quickly as Defendant's post-and-delete—Amiker's personal and professional reputation, character, and standing within the entertainment industry became synonymous with Defendant's knowingly false and defamatory claims.

67.    Amiker had only just begun a new career opportunity with one of the highest-rated radio stations in her hometown.  Amiker could not even celebrate this career milestone because of Defendant's false and defamatory statements.

68.    As soon as Defendant published her false and defamatory statements about Amiker, several celebrity guests who were previously scheduled to appear on the Big Tigger Morning Show canceled their appearances.

69.    For Amiker, such cancellations represent appreciable professional losses, in that such celebrity appearances could have developed into further professional advancement, created genuine networking opportunities, and resulted

in future bookings or other future income.

70.    Amiker was further set to meet with potential advertising clients for V-103 until Defendant's false and defamatory statements about Amiker.  However, those opportunities are now at a standstill as the controversy Defendant created looms over Amiker's future.

71.    Similarly, Amiker's other appearances and hosting opportunities, aside from on-air celebrity appearances and potential advertising clients, were canceled as a result of Defendant's false and defamatory statements.

72.    Amiker's name is permanently tarnished by Defendant's false and defamatory statements, given the high-profile nature of Defendant's false claims regarding Amiker and Morgan.

73.    In an attempt to mitigate further damage to her brand, character, reputation, and standing in the community, Amiker published the following on her Instagram page on June 9, 2026:



74.    Defendant's calculated plan and campaign of publishing false and defamatory statements and impressions about Amiker have caused Plaintiff to be subject to incessant public and private harassment, humiliation, ridicule, and threats to her safety.

75.    Amiker is constantly reminded of Defendant's lies whenever anyone posts a disrespectful or demeaning comment under any one of her posts.

18





19

76. Defendant was keenly aware of the impact her false and defamatory statements would have on Amiker, as a woman in a male-dominated industry.

77. The mere insinuation of a successful woman at the height of her career engaging in an untoward affair with a married man carries all sorts of implications that can, and have, undermined everything Amiker has worked for until this point.

78. Amiker has been forced to enter into a 12-month contract with a crisis management and public relations team to manage the immediate damage to her personal brand and professional reputation *solely* because of the senseless falsities Defendant repeated, and continues to repeat, to anyone who will listen.

79. Moreover, Amiker's future opportunities with brands, sponsors, advertisers, agents, networks, casting directors, production companies, and business partners are jeopardized because her name and personal brand are forever associated with false claims of infidelity and violence against women, not Amiker's professional accomplishments, which she has earned over the course of sixteen years.

80. As a direct and proximate result of Defendant's unlawful and tortious conduct, Amiker's personal and professional reputation in the entertainment industry has been permanently damaged.

81. As a direct and proximate result of Defendant's unlawful and tortious

20

conduct, Amiker has suffered anxiety, fear, emotional distress, embarrassment, humiliation, stress, and other mental pain and suffering.

82.   As a direct and proximate result of Defendant's unlawful and tortious conduct, Amiker's current and future business prospects, partnerships, endorsements, sponsorships, opportunities in radio, film, and television, and other endeavors in the entertainment industry are permanently damaged.

## COUNT ONE

## CAUSE OF ACTION FOR DEFAMATION

83.   Amiker adopts and incorporates Paragraphs 1 through 82 as though the same were set forth herein in their entirety.

84.   On or about May 11, 2026, Defendant published, or caused to be published, certain false and defamatory statements about Amiker on Instagram (the "May 11 Posts").

85.   Specifically, the May 11 Posts contain the following false statements about Amiker:

a.   Through the Instagram account for @nursekat.rn19, and on information and belief, Defendant stated: "Are we not going to address that Tiggers wife is in the hospital because of his relationship with @francescaamiker? The report said that her husband @bigtiggermorningshow said the altercation happened because of his new co host. @v103atlanta yall messy!"

b.   Through the Instagram account for @nursekat.rn19, and on information and belief, Defendant stated: "They must have deleted my comment about his wife being in the hospital probably because he is

21

probable [sic] messing with @francescaamiker. @yourtravelingbestie_ i saw your comment. He blocked me so I am sure you can find who she is."

c. Through the Instagram account for @yourtravelingbestie_, and on information and belief, Defendant stated: "@nursekat.rn19 I think I found her.  I do not want to tag her to embarrass her. But I hope she is ok.  That would suck to be in the hospital while your husband works with his ex.  Especially if she is the reason you are in the hospital."

d. Through the Instagram account for @nursekat.rn19, and on information and belief, Defendant stated: "All I know is the report said the altercation involved a new cohost that was starting Monday. And then boom everyone is at work as if nothing happened. And there is this new cohost."

86.    On or about May 12, 2026, Defendant published, or caused to be published, certain false and defamatory statements about Amiker on Instagram (the "May 12 Posts").

87.    Specifically, the May 12 Posts contain the following false statements about Amiker:

a. Through the Instagram account for @lakenny75, and on information and belief, Defendant stated: "I saw the messages yesterday about her messing with Big Tigger. Now we all know how she got the job. . . . She gave him an amazing lollipop[.]"

b. Through the Instagram account for @thecyberbae, Defendant stated: "@lakenny75 @bigtiggershow he is my husband actually and he asked me to respond to you. Yes we are getting a divorce over his relationship with Francesca but it was not your place to tell everyone. However I do thank you for confirming what I already knew! Can you DM me please"

22

88. On or about June 6, 2026, Defendant published a false and defamatory statement about Amiker on Instagram ("June 6 Post").

89. Specifically, and through the Instagram account for @thecyberbae, Defendant stated: "Someone ask my husband why my face happened @francescaamiker" alongside a video of Defendant with an apparent injury to her face while weeping.

90. The above-referenced statements are of and concerning Amiker.

91. The above-referenced statements are false.

92. The above-referenced statements are defamatory.

93. By making the above-referenced statements about Amiker, Defendant conveyed and intended to convey a false and misleading impression of Amiker.

94. The gist of the false and defamatory statements made by Defendant in the May 11 Posts, May 12 Posts, and the June 6 Post conveys to the average reader and/or listener on Instagram that Amiker was engaged in an illicit affair with Defendant's husband; that Amiker obtained employment opportunities through Defendant's husband by engaging in an illicit affair; that Amiker maintains a relationship with Defendant's husband beyond a mere working relationship as colleagues; that Defendant became the subject of physical abuse because of Amiker; that Defendant became the subject of physical abuse because of Amiker was engaged in an illicit affair with Defendant's husband; that Amiker physically

abused Defendant; and/or that Amiker condoned, encouraged, or allowed physical abuse toward Defendant.

95. The false and defamatory statements made by Defendant about Amiker constitute defamation *per se* in that they directly and/or implicitly impute actions to Amiker that charge her with being guilty of some debasing act which may exclude her from society.

96. The false and defamatory statements made by Defendant about Amiker constitute defamation *per se* in that they directly and/or implicitly impute actions to Amiker that injure her professional reputation.

97. The false and defamatory statements made by Defendant about Amiker constitute defamation *per se* in that they directly and/or implicitly impute actions to Amiker that are defamatory and injurious to her reputation on its face and can be so understood without reference to any additional or extrinsic facts.

**Defendant Published False Statements Negligently and With Actual Malice**

98. Defendant published the May 11 Posts, the May 12 Posts, and the June 6 Post containing the false and defamatory statements described herein negligently and with actual malice.

99. Defendant knew or should have known her statements were false because Amiker has never engaged in an affair with Defendant's husband.

24

100.    Defendant knew her statements were false because Defendant neither had nor identified any reliable source for the false accusation that Amiker engaged in an affair with Defendant's husband, as publicized in the May 11 Posts and the May 12 Posts.

101.    Defendant knew her statements were false because Defendant neither had nor identified any reliable source for the false accusation that Amiker was the reason for the dissolution of Defendant's marriage, as publicized in the May 11 Posts and the May 12 Posts.

102.    Defendant knew her statements were false because Defendant neither had nor identified any reliable source for the false accusation that Amiker had anything to do with any physical injuries Defendant allegedly sustained, as publicized in the June 6 Post.

103.    On information and belief, Defendant sought to financially benefit from the false and defamatory statements made about Amiker.

104.    After major publications circulated Defendant's false and defamatory statements about Amiker, Defendant began promoting her forthcoming app.



105. On June 11, 2026, Tiffany N. Watkins, Esq., on behalf of Amiker, sent a letter to Defendant in which she informed Defendant that her statements described herein were false and defamatory as to Amiker.

106. Evidencing a continued reckless disregard for truth or falsity, Defendant failed and refused to publish a retraction and correction of the false and defamatory statements of and concerning Amiker.

## Damages

107. Defendant's false and defamatory statements described herein were published to third parties and were, in fact, viewed by third parties in the State of Georgia, across the United States, and around the world.

108. As a direct and proximate result of the false and defamatory statements described herein, Amiker's personal and professional reputation has been permanently damaged.

109. As a direct and proximate result of the false and defamatory statements, Amiker has suffered anxiety, fear, emotional distress, embarrassment, humiliation, stress, and other mental pain and suffering.

110. As a direct and proximate result of the false and defamatory statements described herein, Amiker has suffered public hatred, contempt, scorn, and ridicule.

111.   As a direct and proximate result of the false and defamatory statements described herein, Amiker has suffered special damages.

112.   Amiker has lost out on significant business opportunities and stands to lose out on future partnerships, endorsements, sponsorships, opportunities in radio, film, and television, and other endeavors in the entertainment industry as a direct and proximate result of the false and defamatory statements described herein.

113.   As set forth above, Defendant's false and defamatory statements amount to defamation *per se* entitling Amiker to presumed damages.

114.   Defendant has not retracted or corrected her false and defamatory statements despite knowledge of falsity.

115.   Defendant's conduct demonstrates willful misconduct and an entire want of care that raises a conscious indifference to consequences.

## COUNT TWO

### ATTORNEY'S FEES AND EXPENSES OF LITIGATION

116.   Amiker adopts and incorporates Paragraphs 1 through 82 as though the same were set forth herein in their entirety.

117.   Pursuant to O.C.G.A. § 13–6–11, Defendant has acted in bad faith, has been stubbornly litigious, and/or has caused Amiker unnecessary trouble and expense, for which Amiker is entitled to recover her expenses of litigation, including reasonable attorney's fees and expenses, from Defendant.

118.   Because Defendant has failed and refused to publish a retraction of her false and defamatory statements, Amiker was forced to incur attorney's fees and expenses in an effort to resolve this matter and Amiker will be forced to continue to incur additional attorney's fees and expenses during the pendency of this litigation unless and until this matter is resolved.

## COUNT THREE

## PUNITIVE DAMAGES

119.   Amiker adopts and incorporates Paragraphs 1 through 82 as though the same were set forth herein in their entirety.

120.   Defendant's false and defamatory statements were published with constitutional actual malice thereby entitling Amiker to an award of punitive damages pursuant to O.C.G.A. § 51–12–5.1.

121.   Amiker is also entitled to an award of punitive damages pursuant to O.C.G.A. § 51–12–5.1 to punish Defendant for her unlawful conduct and to penalize and deter her from repeating such unlawful and egregious conduct.

122.   The actions and inactions of Defendant demonstrate a specific intent to cause the intended harm, authorizing punitive damages in excess of $250,000 pursuant to O.C.G.A. § 51–12–5.1.

**WHEREFORE,** Plaintiff Francesca Amiker respectfully requests a judgment in her favor and against Defendant Alicia Brown, as follows:

28

(a)    Awarding Plaintiff compensatory damages in an amount to be proven at trial;

(b)    Awarding Plaintiff her recoverable costs and disbursements, including her reasonable attorney's fees pursuant to O.C.G.A. § 13–6–11;

(c)    Awarding Plaintiff punitive damages pursuant to O.C.G.A. § 51–12–5.1;

(d)    Awarding Plaintiff post-judgment interest; and

(e)    Granting Plaintiff such other relief as the Court deems equitable, just, and proper.

## JURY DEMAND

Plaintiff demands a trial by jury as to all claims to which she is entitled. This request is without prejudice to, or waiver of, Plaintiff's right to move for judgment on all issues that may be decided by the Court.

Respectfully submitted, this __30th__ day of June 2026.

**EVANS BOWERS**

*/s/ Tiffany N. Watkins*
Stacey G. Evans
Georgia Bar No. 298555
Tiffany N. Watkins
Georgia Bar No. 228805
729 Piedmont Avenue, NE
Atlanta, Georgia 30308
Telephone: 404-850-6750
Facsimile:  404-850-6748
sevans@evansbowers.com

29

twatkins@evansbowers.com

*Attorneys for Plaintiff Francesca Amiker*

30